UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RUTH JANICE JONES, | ) | CASE NO. 1:18CV2676 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Ruth Janice Jones ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Disability Insurance Benefits ("DIB").  ECF Dkt. #1.  In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") failed to: (1) properly evaluate the opinions of her treating sources; (2) properly evaluate her credibility; and (3) meet the burden at Step Five of the Steps for Evaluating the Entitlement to Disability Benefits.  ECF Dkt. #13.  For the following reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND Plaintiff's case to the ALJ for reevaluation and analysis of Dr. Schnell's opinion.

## I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on February 17, 2016 alleging disability beginning September 29, 2015 due to a shattered left wrist, broken pelvic bone, generalized anxiety disorder, recurrent depression, and degenerative disc disease ("DDD") in her neck and spine.  ECF Dkt. #11 ("Tr.") at 235-236, 263.[2]  The Social Security Administration ("SSA") denied her application initially and upon reconsideration.  *Id.* at 171-187.  Plaintiff requested a hearing before

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

an ALJ, and the ALJ held a hearing on November 8, 2017, where Plaintiff was represented by counsel and testified.  *Id*. at 81, 188.  A vocational expert ("VE") also testified.  *Id.*

On May 1, 2018, the ALJ issued a decision denying Plaintiff's application for DIB.  Tr. at 16-26.  Plaintiff requested that the Appeals Council review of the ALJ's decision and the Appeals Council denied her request for review on September 24, 2018.  *Id*. at 1-4

On November 19, 2018, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  She filed a merits brief on March 13, 2019 and Defendant filed a merits brief on May 29, 2019.  ECF Dkt. #s 13, 17.  Plaintiff filed a reply brief on June 11, 2019.  ECF Dkt. #18.

## II.  RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.  MEDICAL EVIDENCE

#### 1.  PHYSICAL IMPAIRMENTS

Notes dated May 14, 2015 from Dr. Hanna, a neurologist, show that Plaintiff presented for chronic neck pain for the last twenty years.  Tr. at 981.  Upon examination, Dr. Hanna found normal motor strength, sensation and a normal gait, but abnormal reflexes.  *Id*. at 984.  He diagnosed Plaintiff with cervical spondylosis and decided to treat her conservatively with medications and exercises.  *Id*.  He indicated that Plaintiff should not perform manual work above her shoulders in order to avoid prolonged cervical extension.  *Id.*

On September 27, 2015, Plaintiff presented to the emergency room after she had tripped over her cat and fell, injuring her left wrist and pelvis.  Tr. at 421, 473.  There was a consultation with Dr. Sechler as Plaintiff had an abnormal EKG, but it ended up being a baseline artifact that was misread by the computer.  *Id*. at 422, 475.  The consultation note indicated that Plaintiff reported never having cardiac issues and being very active as she played golf and basketball, and she mowed her own yard.  *Id.*  Physical examination revealed an obvious deformity in Plaintiff's left wrist and tenderness to palpation of her left hip.  *Id.* at 473.  X-rays showed a left wrist radius ulnar fracture with radial displacement of the distal fracture fragment and displaced ulnar styloid fracture, and a mildly displaced comminuted left iliac bone and acetabular fracture and mildly displaced angulated fracture of the left inferior pubic ramus.  *Id.* at 474, 502, 507, 509, 667.  A brain CT scan showed no abnormality, and a neck CT scan showed mild posterior disc osteophytes and bilateral facet

arthropathy at C2-C3, C3-C4, C4-C5, C5-C6, and C6-C7, with mild to moderate left neural foraminal encroachment at C2-C3, moderate to severe right neural foraminal and mild to moderate left neural foraminal narrowing at C3-C4, mild canal stenosis and mild to moderate bilateral neural foraminal encroachment at C4-C5, moderate to severe canal and bilateral neural foraminal stenosis at C5-C6, and severe canal and bilateral neural foraminal encroachment at C6-C7. *Id.* at 506.

Dr. Schnell, an orthopedic surgeon, examined Plaintiff on September 28, 2015 and recommended an open reduction and internal fixation for her left wrist, to which she agreed. Tr. at 478. Plaintiff underwent a left distal radius open reduction and internal fixation on September 28, 2015. *Id.* at 479, 673. Plaintiff was discharged from the hospital on September 30, 2015. *Id.* at 482.

Dr. Schnell's October 9, 2015 treatment notes show that Plaintiff followed up for her left wrist and hip and she reported that her pain level was 6 out of 10 and he was not bearing weight on either extremity. Tr. at 648. Dr. Schnell noted that x-rays showed satisfactory alignment of the fracture and hardware and no significant displacement of the acetabular fracture of the left hip. *Id.* Dr. Schnell reminded Plaintiff of the severity of her wrist injury and how unstable it was with marked articular comminution. *Id.* He stressed to her that she was not to bear weight for at least 6 weeks and he put her in a long arm fiberglass cast. *Id.* He also told her not to bear weight on her left lower extremity. *Id.*

On October 23, 2015, Plaintiff followed up with Dr. Schnell and he noted no obvious deformity and that her wound was healing. Tr. at 585, 647. X-rays showed that there was some interval subsidence of the posterior articular surface of the distal radius with questionable penetration of the screws. *Id.* X-rays of the pelvis showed no evidence of any significant displacement of the fracture. *Id.* Dr. Schnell told Plaintiff that there was some subsidence of the articular surface dorsally and she would likely benefit from elevation articular surface of dorsal plating. *Id.* He also indicated that he wanted to consult with colleagues concerning her wrist x-rays. *Id.*

On October 27, 2015, Plaintiff followed up with Dr. Schnell after he reviewed her x-rays with colleagues and they agreed with him about re-reducing the fracture and plating the dorsal

-3-

radius, which would require removing the pins from the volar side also.  Tr. at 587, 649.  He discussed the surgery with Plaintiff.  *Id.*

On October 30, 2015, Plaintiff underwent a revision of open reduction and internal fixation of a left distal radial fracture with failure of fixation.  Tr. at 423.  He noted that Plaintiff underwent an open reduction and internal fixation with a volar locking plate on September 27, 2015, but at her one-month follow up, she showed a loss of fixation with dorsal collapse of the articular surface.  *Id.* Dr. Schnell noted that they discussed a revision surgery and the risks associated with it, and Plaintiff wished to proceed with surgery, which was performed on October 30, 2015.  *Id.*  The procedure went well and there were no complications.  *Id.* at 426.

Dr. Schnell's November 6, 2015 treatment note indicates that Plaintiff followed up with him and said her pain was well-controlled, but she was upset that a home health aide told her that she could bear weight on the left side, although she was using a cane due to her hip and groin pain.  Tr. at 588, 646, 658.  X-rays of the left wrist showed satisfactory alignment of the fracture and hardware.  *Id*.  Dr. Schnell advised Plaintiff of the seriousness of her wrist injury and he explained that she was likely going to have significant posttraumatic arthrosis in the future.  *Id.* at 588.

On November 13, 2015, Plaintiff followed up with Dr. Schnell for her left wrist and she reported that her pain was improving, but she was still having volar radial wrist pain.  Tr. at 584, 645. He removed her sutures and placed her in a short arm fiberglass cast.  *Id.*  November 30, 2015 treatment notes indicate that Dr. Schnell reviewed x-rays with Plaintiff which showed that despite the buttressing of the dorsal articular surface, she had further collapse.  *Id.* at 589, 645.  He told her that there were not many good options and they discussed putting an external fixator on, although Plaintiff did not seem interested and he indicated that even with the external fixator, he could not guarantee that the outcome would be significantly better.  *Id.*  He put her wrist back in a cast.  *Id*.

Dr. Schnell's December 11, 2015 treatment note shows that Plaintiff presented with complaints of moderate pain in her left wrist and chronic aching in her pelvic area and lower back, especially after prolonged walking.  Tr. at 589, 650.  X-rays showed no significant interval changes in the overall alignment of her wrist fracture and some collapse of the dorsal articular surface with

-4-

dorsal translation of the lunate.  *Id*.  He put her in a wrist splint and limited her range of motion in the wrist with no weight-bearing, as further collapse could occur with weight-bearing.  *Id*.

Treatment notes from January 7, 2016 show that Plaintiff presented to Dr. Stecyk for medication refills and complaints of sinus problems and left leg swelling.  Tr. at 613.  Physical examination showed left lower extremity edema, but normal range of motion and strength.  *Id*. at 615-616.  He diagnosed Plaintiff with acute sinusitis, insomnia, and statis edema of the left lower extremity.  *Id*. at 616.  He ordered an ultrasound of Plaintiff's left lower extremity.  *Id.* The duplex scan was negative for acute deep vein thrombosis.  *Id.* at 628.

January 8, 2016 treatment notes from Dr. Schnell show that Plaintiff followed up for her wrist pain.  Tr. at 603.  She reported that she still had significant pain in the wrist, but the pain in her pelvis was improving.  *Id*.  X-rays of the wrist showed intraarticular penetration of the distal locking screws.  *Id*.  Dr. Schnell informed Plaintiff that the hardware would need to come out of her wrist because of irritation of the tendons from the volar plate.  *Id*.  He advised Plaintiff that she would likely have chronic pain and may ultimately need a fusion.  *Id*.

On January 28, 2016, Plaintiff presented to the emergency room with neck pain.  Tr. at 400.  She explained that she was reaching up into a cabinet with her right hand and her neck popped and she felt some left arm pain and paresthesias.  *Id.*  Physical examination showed that Plaintiff was in no apparent distress, except for a supple neck with cervical paraspinal pain with palpation, and normal extremities with no edema.  *Id.* at 401.  Plaintiff was diagnosed with acute cervical sprain and cervical radiculitis and given injections of Toradol and Norflex.  *Id*.  A cervical x-ray showed Grade 1 retrolisthesis at C5-C6 and C6-C7 and severe disc space narrowing at those points anterior endplate osteophytes.  *Id*. at 403, 634. The impression was  cervical spondylosis and Plaintiff was given medications, told to ice the area, and discharged with  a cervical collar.  *Id*. at 402.

On February 1, 2016, Plaintiff presented to Dr. Schnell and reported that her neck was feeling better, but she had crepitation with flexion/extension of her fingers and pain and swelling of the left long finger.  Tr. at 651.  Dr. Schnell noted swelling along the incision of the left hand with some crepitation volarly with flexion/extension of the fingers.  *Id*.  X-rays showed the previously

noted collapse of the articular surface with intraarticular penetration.  *Id*.  Dr. Schnell talked with Plaintiff about the x-ray and informed her that she was getting significant tendon irritation and he recommended taking the plates out of her wrist to prevent further tendon injury.  *Id*. He also told Plaintiff that she may require further surgery at a later date.  *Id*.

February 4, 2016 treatment notes from Dr. Stecyk indicate that Plaintiff presented to him for medication refills.  Tr. at 609.  Review of Plaintiff's symptoms indicated that she complained of anxiety and neck pain, and x-rays showed degenerative joint disease.  *Id*.  He also noted that Plaintiff saw Dr. Schnell for her left wrist fracture.  *Id*.  Dr. Stecyk noted no masses or swelling in Plaintiff's neck, no back pain or myalgias, no difficulty walking or limb weakness, no numbness or tingling, and no anxiety or depression.  *Id*. at 609-610.  Physical examination showed tenderness in the neck, left wrist tenderness and swelling, normal range of motion and muscle strength, intact judgment and insight, and normal mood and affect.  *Id*. at 611.  He diagnosed anxiety, insomnia, left arm fracture, and neck pain.  *Id*. at 611-612.  He added a medication, renewed her other medications, and referred her for physical therapy for neck pain.  *Id*. at 612.

On February 24, 2016, Plaintiff underwent surgery by Dr. Schnell to remove symptomatic hardware from her left wrist.  Tr. at 364, 597, 670.  The operative report outlined Plaintiff's original injury in September of 2015 and her subsequent open reduction and internal fixation and allograft bone grafting.  *Id*.  The report also noted that after the first procedure, Plaintiff underwent a second procedure on October 30, 2015 with revision for placement of the volar hardware and a dorsal plate.  *Id*.  Dr. Schnell further noted that the articular surface collapsed again despite the two procedures and Plaintiff developed crepitation along the volar aspect of the wrist with finger flexion and extension.  *Id*.  The decision was then made to remove the plates with this third procedure.  *Id*.  The hardware was removed and Plaintiff tolerated the third procedure well.  *Id*. at 365.

Treatment notes from Dr. Schnell indicate that on February 26, 2016, Plaintiff reported that her pain was tolerable and she no longer had the crepitus with flexion/extension of her fingers.  Tr. at 583. Dr. Schnell noted that Plaintiff had minimal bleeding and well-approximated incisions, and Plaintiff could flex/extend her fingers with no evidence of crepitation.  *Id*.

-6-

On March 3, 2016, Plaintiff presented to Dr. Stecyk for her neck pain and he found no masses and no swelling in the neck, and he found that Plaintiff had no difficulty walking, no limb weakness, no numbness, and no tingling.  Tr. at 605-606.  He noted left wrist and neck tenderness, but normal muscle strength and range of motion.  *Id*. at 607.  He found that her judgment and insight were intact, and her mood and affect were normal, with no anxiety or depression.  *Id.* at 606-607.  He diagnosed Plaintiff with anxiety, depression, left arm fracture, and neck pain.  *Id*. at 608.  He renewed her psychiatric medications and prescribed Oxycodone for her pain.  *Id.* at 607.

March 4, 2016 notes from Dr. Schnell show that Plaintiff was doing well after surgery and he removed Plaintiff's suture and put her in a temporary volar splint.  Tr. at 655.

On April 4, 2016, Dr. Schnell wrote a "To Whom This May Concern" letter indicating that Plaintiff had fallen down a staircase on September 27, 2015 and suffered a significant left wrist fracture and fractures to her superior and inferior pubic rami.  Tr. at 702.  He described her wrist surgeries and concluded that, "[d]ue to the severity of her original injury and multiple surgeries, the patient's progress has been slow.  She has been unable to work during this recovery."  *Id*.

April 8, 2016 treatment notes from Dr. Schnell indicate that Plaintiff presented with more wrist pain and a red raised area over her left wrist incision.  Tr. at 652.  Dr. Schnell noted the small raised area over the wrist and a small vicryl suture working its way through the skin.  *Id.*  He diagnosed a small vicryl stitch abscess and removed it.  *Id*. at 652.  Plaintiff followed up on April 15, 2016 and reported that the pain was better, but she had pain along the ulnar aspect of the wrist that radiated proximally.  *Id*. at 653.  Dr. Schnell's examination showed that there was no swelling over the wrist, but Plaintiff was very tender along the volar aspect of the wrist.  *Id*.  He also noted that Plaintiff was able to fully flex and extend the fingers and thumb, but her wrist range of motion was limited due to discomfort.  *Id*.  He prescribed anti-inflammatories for pain.  *Id.*

On May 20, 2016, Dr. Schnell's treatment notes show that Plaintiff presented for right wrist pain and numbness and tingling.  Tr. at 654, 720.  Examination showed that she was able to fully flex and extend her fingers and thumb, but she had a positive Tinel's and Phalen's at the wrist. *Id*.  Dr. Schnell believed that Plaintiff was developing carpal tunnel syndrome ("CTS"), and he ordered an EMG of Plaintiff's left wrist.  *Id*.

-7-

Dr. Schnell wrote another "To Whom It May Concern" letter on June 2, 2016 indicating that Plaintiff fell down a staircase on September 27, 2015 and sustained a left wrist fracture and fractures to her superior and inferior pubic rami. Tr. at 700. He noted that she underwent a left wrist open education and internal fixation on September 28, 2015 and upon failure of the fixation surgery, she underwent revision surgery on October 30, 2015 and she was immobilized for an extended period of time. *Id.* He further noted that Plaintiff participated in physical therapy and then hardware irritation developed and Plaintiff underwent a third surgery on February 24, 2016 to remove the plates on the volar and dorsal aspects of her wrist. *Id.* Dr. Schnell continued that Plaintiff was having intermittent pain, numbness and tingling along the ulnar part of her wrist and she appeared to be developing CTS. *Id.* Dr. Schnell concluded that Plaintiff's progress had been "very slow" and she had not been able to work during her recovery "[d]ue to the severity of her original surgery, having multiple surgeries and her ongoing symptoms." *Id.*

June 3, 2016 treatment notes show that Dr. Schnell discussed the EMG results with Plaintiff which showed very subtle evidence of irritation of the left ulnar sensory branches to the fifth finger and no evidence of cervical radiculopathy. *Id.* at 654, 660, 709, 720. He told her to finish the medication that he prescribed to reduce the swelling and then take Aleve as once the swelling decreased, the ulnar nerve irritation should as well. *Id.* He also had her wear a wrist splint when she was active. *Id.*

July 29, 2016 treatment notes from Dr. Schnell indicate that Plaintiff presented complaining of significant left wrist pain, with numbness and shooting pain along the dorsoulnar aspect of her wrist and fingers. Tr. at 719. He gave her a corticosteroid injection and ordered a bone density scan and Vitamin D and calcium levels due to significant bone fractures and poor bone quality. *Id.*

On August 5, 2016, Plaintiff had a left wrist dexa scan which showed that her bone mineral density of the left femoral neck was borderline osteopenic and she was at an increased risk for fracture. Tr. at 721-722.

A MRI of Plaintiff's cervical, thoracic and lumbar spines conducted on September 30, 2016 showed that Plaintiff had multilevel DDD with uncovertebral spurring in the cervical spine, most severe at C5-C6 and C6-C7. Tr. at 821. The thoracic spine MRI showed minimal T3-T4 disc bulge,

-8-

and the lumbar spine MRI showed multilevel DDD with the greatest degrees of lateral recess and foraminal stenosis at L4-L5.  *Id*. at 821-822.

Plaintiff underwent an EMG/nerve conduction study on October 28, 2016 which showed right cervical radiculopathy, mild right ulnar compression neuropathy at the elbow, mild right CTS, and underlying sensory neuropathy.  Tr. at 818.

Dr. Schnell indicated in his November 18, 2016 treatment note that Plaintiff presented for follow up of her left wrist pain and numbness and tingling in her small finger.  Tr. at 718.  She requested a repeat Lidocaine injection, which he gave her.  *Id.*  He indicated that her persistent left wrist pain was likely secondary to post-traumatic arthrosis and he advised her to avoid strenuous activities with her left upper extremity.  *Id*.

On December 9, 2016, Plaintiff presented to Dr. Stecyk for medication refills and she reported that she had fallen the day before and twisted her left ankle and knee.  Tr. at 969.  He noted that Plaintiff had chronic pain and anxiety.  *Id*.  Upon examination, Dr. Stecyk found an abnormal inspection/palpation of Plaintiff's joints, bones and muscles, and tenderness in the left foot, ankle and knee, but normal ranges of motion and strength.  *Id*. at 971-972.  He also noted that Plaintiff's insight and judgment were intact and her mood and affect were normal.  *Id*. at 972.

March 2, 2017 treatment notes from Dr. Schnell indicate that Plaintiff presented to him complaining of significant left wrist pain with rotational activity supination/pronation, and numbness and tingling of the index, long fingers and occasionally the small finger.  Tr. at 717.  She also complained of neck and back pain for which she was seeing another physician.  *Id.*  Dr. Schnell ordered another EMG/nerve conduction study.  *Id*.

March 13, 2017 nerve conduction studies of the left hand and neck ordered by Dr. Schnell showed normal results.  Tr. at 704, 757-759.  Dr. Schnell concluded that he could not find any focal nerve or nerve root entrapments to explain Plaintiff's left hand numbness.  *Id*. at 706.  However, he opined that Plaintiff was possibly having a digital nerve irritation/injury or symptoms from ongoing irritation of a nerve or nerve root structure without nerve injury, since her numbness involved only the very terminal portion of the left fingers, that is, the index and middle fingers.  *Id*.

Dr. Schnell's March 20, 2017 treatment notes indicate that he reviewed Plaintiff's latest

EMG results, which showed no evidence of CTS or compression of the ulnar nerve.  Tr. at 716.  He noted that Plaintiff was crying and stating that her pain limited her ability to function throughout the day.  *Id.*  Upon examination, Dr. Schnell noted no swelling or tenderness over the dorsoulnar aspect of the wrist, and smooth, non-painful movement upon pure flexion/extension fo the left wrist.  *Id.*  Dr. Schnell indicated that x-rays showed that Plaintiff had significant collapse of the distal radius with radial shortening as well as irregularity along the joint line.  *Id.*  He noted that Plaintiff was significantly ulnar positive with evidence of ulnar impaction syndrome.  *Id.*  He discussed with her another wrist surgery, including possible ulnar shortening osteotomy.  *Id.*  She was unsure that she wanted to proceed with another surgery.  *Id.*

April 11, 2017 results from a neuromuscular ultrasound of the left wrist and elbow were abnormal as they showed that Plaintiff had a mild left ulnar neuropathy at the elbow and multiple bony changes around the area of the wrist which were most likely the prior trauma and surgery.  Tr. at 746.  The results concluded that Plaintiff had "potential promptly ulnar nerve at the cubital tunnel and in the distal forearm."  *Id.*

Left shoulder imaging performed May 25, 2017 after Plaintiff indicated that she had fallen one week prior indicated that she had a comminuted mildly displaced fracture of the left humeral greater tuberosity, but no dislocation.  Tr. at 712, 715, 773.

May 26, 2017 notes from Dr. Sweet, a neurosurgeon, indicate that Plaintiff presented to her for a follow up neurosurgical visit regarding her ulnar neuropathy.  Tr. at 727.  Dr. Sweet noted Plaintiff's neck pain and bilateral left upper and lower left extremity pain, status post left wrist fracture with multiple surgeries, and her cervical issues.  *Id.*  Upon examination, Dr. Sweet noted that Plaintiff's muscle strength was abnormal due to the inability to assess on the left due to the left shoulder and wrist fracture.  *Id.* at 729.  She further noted that Plaintiff had decreased sensation in the left index and middle fingers and abnormal reflexes.  *Id.*  Dr. Sweet further indicated that she reviewed Plaintiff's cervical spine MRI from September of 2016 which showed loss of normal lordosis, notable stenosis, worse at C6-C7 with broad-base disc, slightly eccentric to left and C5/C6 disc, eccentric to right.  *Id.*  She noted the recent upper extremity EMG which showed left ulnar neuropathy and left C7 radiculopathy, and a prior EMG of the right upper extremity showing mild

-10-

right ulnar neuropathy and CTS.  *Id*. She further noted a recent ultrasound of the left ulnar nerve which showed some compression of the ulnar nerve at the elbow, and severe compression at Guyon's canal in the wrist.  *Id.*  Further, she noted the previous ultrasound of Plaintiff's right ulnar nerve which showed compression and subluxation of the ulnar nerve at the elbow.  *Id.*

Based upon her examination and review of the test results, Dr. Sweet's impressions were that Plaintiff had multiple orthopaedic injuries, including a left shoulder fracture, a left wrist fracture status post multiple surgeries, and a prior left hip/pelvis fracture.  Tr. at 729.  Her further impressions were that Plaintiff had clinical and radiographic evidence of cervical stenosis and C6 and C7 radiculopathies with bilateral upper extremity weakness, brisk reflexes, and a MRI with C5-6 and C6-7 stenosis, in addition to mild right ulnar neuropathy at the elbow with subluxation of nerve and moderate left ulnar neuropathy both at the epicondylar groove and Guyon's canal.  *Id*.  She recommended that Plaintiff first take care of the left shoulder fracture, then proceed with an anterior cervical discectomy and fusion of C5-6 and C6-7, followed by conservative management of the ulnar nerves, and then a discussion with her surgeon concerning repeat surgery of the left wrist.  *Id.*

June 12, 2017 notes from Dr. Schnell show that Plaintiff reported falling three weeks prior due to balance issues and weakness in her lower extremities.  Tr. at 715.  Plaintiff told him that she fractured her proximal humerus and the neurosurgeon had suggested cervical spine fusion.  *Id*. Upon examination, Dr. Schnell indicated that Plaintiff had minimal tenderness about the proximal humerus with normal range of motion in the shoulder and 170 degrees of forward flexion.  *Id*.  His assessment was that Plaintiff had a left shoulder greater tuberosity fracture that maintained satisfactory
alignment which was amenable to non-operative management.  *Id*.  Dr. Schnell instructed Plaintiff in gentle range of motion exercises and advised her to avoid heavy lifting, pushing or pulling.  *Id.*

A CT scan of Plaintiff's cervical spine conducted on June 28, 2017 showed that she had multilevel degenerative changes resulting in foraminal and canal stenosis, most prominent at C5-Ct and C6-C7 levels.  Tr. at 771.

August 4, 2017 treatment notes from Dr. Schnell indicate that Plaintiff was doing well from the fracture, but she was to avoid heavy lifting, or pushing and pulling with the shoulder.  Tr. at 713.

-11-

July 7, 2017 treatment notes indicate that Dr. Schnell examined Plaintiff regarding her left shoulder and found no swelling and better range of motion.  *Id.* at 714.  X-rays showed previously noted fracture and no significant displacement.  *Id.*  Dr. Schnell told Plaintiff to work on her range of motion, but to perform no heavy lifting, pushing or pulling.  *Id.*

On August 31, 2017, Plaintiff underwent a C5-C6 and C6-C7 anterior cervical discectomy and fusion performed by Dr. Sweet for her herniated disks.  Tr. at 750.

On October 23, 2017, Dr. Schell completed a physical medical source statement on behalf of Plaintiff and indicated that he had been treating her from September 28, 2015 to the present.  Tr. at 973.  He cited her diagnoses as left distal radius fracture, left wrist post-traumatic radial carpal arthritis, left pelvic fracture and left proximal humerus fracture.  *Id.*  He opined that her prognosis was fair and he listed her symptoms as chronic left wrist pain, stiffness, and swelling.  *Id.*  Dr. Schnell further identified the clinical and objective findings supporting his diagnoses and he indicated that the impairments lasted or would be expected to last at least twelve months or more. *Id*.  He further affirmed that emotional factors contributed to the severity of Plaintiff's symptoms and limitations due to anxiety.  *Id.*  Dr. Schnell opined that Plaintiff could: walk two city blocks without rest or severe pain;  sit for a total of at least 6 hours per day, from 30 minutes to one to two hours at a time without having to get up; and she could stand for about 2 hours per day for about 30 to 45 minutes at a time without having to sit down or walk around.  *Id.* at 974.  He further opined that Plaintiff needed:  a sit/stand option; periods of walking around during the day every 60 minutes for 5 minutes each time; and to take unscheduled breaks due to pain, parethesias or numbness.  *Id.*  Dr. Schnell also opined that Plaintiff did not need a cane or assistive device for standing or walking, she could occasionally lift and carry objects up to 10 pounds, but she could never carry more, and she could occasionally twist, stoop/bend, crouch/squat, and climb stairs, but she could never climb ladders.  *Id*. at 975.  He further opined that Plaintiff would be off task 15% of the day, she was capable of low stress work, she would have good and bad days, and she would be absent about 4 days per month due to her impairments or treatment.  *Id*. at 976.  Finally, Dr. Schnell commented that Plaintiff had recently undergone a cervical spine fusion and she had chronic low back pain.  *Id.*

-12-

## 2.    **MENTAL IMPAIRMENTS**

On April 20, 2015, Plaintiff underwent a psychiatric evaluation with Dr. Bukuts.  Tr. at 342-346, 682.  She presented to him, indicating that she needed a new medication prescriber since she was new to Medicaid and she had anxious tendencies that ran in her family.  *Id*. at 342.  She indicated that she felt sad and tearful with depression and mornings were the worst time of the day.  *Id*.  She reported that she had been hospitalized in 2010 for a suicide attempt as she had a knife to her neck because of stress with her neighbor.  *Id*.  She also related that she had gotten divorced, her father died 10-15 years ago, and she became the main source of support for her mother, who then died in 2012 due to dementia.  *Id.* Plaintiff explained that she first sought treatment eight years ago.  *Id*. Dr. Bukuts diagnosed Plaintiff with depressive disorder, not otherwise specified, post-traumatic stress disorder ("PTSD"), and alcohol-related disorder, not otherwise specified.  *Id.* at 344.  His plan was to continue her medication of Lexapro, cut back on Xanax, and increase Buspar.  *Id.*   He also educated Plaintiff and referred her to supportive therapy.  *Id.*  He assigned her a global assessment of functioning ("GAF") rating of 57, indicative of moderate symptoms.  *Id.*

On May 11, 2015, Plaintiff presented to Dr. Bukuts for medication management and complained that she was not doing well because her partner unexpectedly passed away from a surgery-related complication.  Tr. at 348.  Plaintiff denied suicidal or homicidal ideations or psychosis, and she reported that she noticed that she was feeling emotionally calmer on the higher dose of Buspar.  *Id*. Dr. Bukuts indicated that Plaintiff had anxiety, depression, panic attacks,  and fatigue, and she was using antidepressants.  *Id.* He noted that Plaintiff was making some progress and he continued her medications.  *Id.* at 349.

On May 26, 2015, Plaintiff presented to Dr. Bukuts and reported that she was still adjusting to the loss of her partner and having anxiety and panic attacks.  Tr. at 350.  He noted that Plaintiff was making minimal progress.  *Id.* at 351.  Dr. Bukuts maintained the same medications for Plaintiff, but he noted that he was tapering the Xanax but Plaintiff was still drinking alcohol two to three times per week, so close monitoring was necessary.  *Id.*  Dr. Bukuts also thought that Plaintiff would benefit from therapy and possible AA meetings.  *Id.*

-13-

Dr. Bukuts' September 25, 2015 treatment notes show that Plaintiff reported still struggling with losing her partner and her mom, but she was staying positive and had started a new relationship. Tr. at 354, 686. Dr. Bukuts described Plaintiff as overly sedated with Vistaril and as having limited insight. *Id*. at 354-355. He noted that Plaintiff was making minimal progress. *Id*. at 355.

Progress notes with Mr. Triscarpi, Rph.show that Plaintiff presented for psychiatric medication refills on September 4, 2015, and he found that she was pleasant and euthymic and she denied depression, although she reported occasional sadness and some anxiety over her new job transporting corpses and setting them up for embalming. Tr. at 685.

On December 9, 2015, Dr. Stecyk noted that Plaintiff presented with an abnormal mood and affect as she was anxious. Tr. at 620. Her judgment and insight were intact. *Id*. She was diagnosed with anxiety and her Xanax was refilled. *Id*.

On April 12, 2016, Dr. Whitmore, Ph.D., performed a psychological evaluation of Plaintiff at the request of the agency. Tr. at 636. She diagnosed Plaintiff with major recurrent depression, adjustment disorder with mixed anxiety and depression, and panic disorder. *Id*. at 640. She opined that Plaintiff's prognosis was "fair to poor at this time." *Id*. In discussing her four work-related mental abilities, Dr. Whitmore noted that Plaintiff told her that she was "excellent" at understanding, remembering and carrying out instructions and she usually does very well with maintaining attention and concentration. *Id*. at 641. As to Plaintiff's abilities to respond appropriately to supervision and coworkers, Dr. Whitmore noted that Plaintiff reported that she worked well with others and Dr Whitmore found that Plaintiff had a pleasant demeanor and was cooperative. *Id*. In describing Plaintiff's abilities and limitations to responding appropriately to work pressures in a work setting, Dr. Whitmore opined that Plaintiff would have difficulty with such pressures because of her psychological and pain issues. *Id*.

Plaintiff presented for follow-up with Dr. Stecyk on November 10, 2016, indicating that her anxiety was bad and she wanted a psychiatry referral. Tr. at 876. Evaluation indicated that Plaintiff's insight and judgment were intact, her mood and affect were abnormal, and she was anxious, depressed and tearful. *Id*. at 878. She was diagnosed with anxiety and arthalgia, her medications were refilled, and she was given a psychiatric referral. *Id*. at 879.

-14-

On February 23, 2017, Plaintiff presented to the emergency room for a psychiatric evaluation after she was talking to her insurance company and told the representative that she was not feeling right.  Tr. at 795, 800.  She stated that she was following up the next day after surgery on her left wrist and she was afraid of the results.  *Id.* at 800.  She told the doctor that she really did not want to hurt herself and she just wanted someone to talk to.  *Id.*  She reported that she had been drinking alcohol and was stressed out about other things, including the loss of her home and car and the loss of her mother within a short period of time.  *Id*. at 800-801.  She had an extremely high blood alcohol level, even though she did not present as intoxicated.  *Id.* at 806.  She was diagnosed with adjustment disorder with anxious mood and discharged with outpatient follow up.  *Id*. at 799.

Emergency department records dated April 27, 2017 indicate that Plaintiff presented for evaluation of suicidal ideations after her friend called police telling them that Plaintiff attempted to harm herself with a knife.  Tr. at 780.  Plaintiff denied suicidal ideations and said she was just stressed out and nervous because of possible surgeries.  *Id.* at 782.  She admitted to drinking a lot of wine prior to arriving and she had acute alcohol intoxication upon presentation.  *Id*. at 780-782.  She was diagnosed with alcohol intoxication delirium with a concern about becoming suicidal, without diagnosis.  *Id*. at 786.

October 3, 2017 treatment notes from Dr. Bukuts show that Plaintiff presented for evaluation and reported that she was still dealing with the loss of her partner 2-3 weeks prior and her mother three years prior, but she remained positive.  Tr. at 686.  She denied suicidal ideations and reported that she had started a new relationship.  *Id.*

On November 7, 2017, Dr. Young completed a mental impairment questionnaire concerning Plaintiff and indicated that he saw Plaintiff one time on July 28, 2017, but she had been seen in the psychiatric department since March of 2017.  Tr. at 988.  He indicated her diagnoses as major depressive disorder; mild alcohol use disorder, and anxiety disorder, unspecified.  *Id.*  He noted her medications as Xanax, Buspar and Lexapro and he noted no side effects.  *Id.*  He described his clinical findings showing the severity of her mental impairment as anxiety, and his prognosis for her was fair if she complied with her treatment.  *Id.*  He opined that her mental health impairments lasted

-15-

or were expected to last at least 12 months, and he found that she had limited, but satisfactory abilities to: remember, understand, and carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance and be punctual; interact appropriately with the general public, ask simple questions and request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behaviors and basic hygiene; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. *Id.* at 988-989. Dr. Young opined that Plaintiff was seriously limited, but not precluded, in the areas of: remembering, understanding, and executing detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; working in coordination with others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; remembering locations and work-like procedures; and setting realistic goals or making plans independently of others. *Id.* He anticipated that Plaintiff's impairments and treatment would cause her to be absent from work at least a couple of days per week, and she would be off task at least 50% of an 8-hour workday due to her impairments and symptoms. *Id.* at 989.

### B. TESTIMONIAL EVIDENCE

At the ALJ hearing held on November 8, 2017, Plaintiff testified that she had two years of college education when she filed her application for DIB and she was studying psychology. Tr. at 87. They discussed her prior employment. *Id.* at 89-97. Plaintiff explained that her last employer let her go from employment because she called off after her mom started acting funny and then subsequently asked for leave under the Family Medical Leave Act to deal with her mom, but her mom died within months as she had the onset of Alzheimer's and cancer. *Id.* at 93.

Plaintiff discussed her three left wrist surgeries, explaining that in September of 2015, she tripped over her cat and fell down the steps, shattering her wrist and breaking her pelvis in two places. Tr. at 97. She explained that she had three surgeries because after the first one to try and fix her shattered bones, things were not connecting or sinking and the doctor went back in and put

-16-

pins and plates in her wrist. *Id.* at 98. Plaintiff testified that she then had horrible pain and the doctor took x-rays which showed that the plate he put in was sinking and not holding, so she had a third surgery to remove all of the pins and plates. *Id.* Plaintiff explained that she is left-handed and even things like putting her hair in a ponytail, showering, cooking and doing dishes hurt her wrist, . *Id.* She also has numbness and has not driven a car since her first surgery because turning the wheel even hurts her. *Id.* at 100.

Plaintiff also explained that she had a cane with her because she had fallen a couple of times as her legs get numb, she has arthritis in her left knee, and constant swelling in her left ankle. Tr. at 101. She just started using the cane five months ago and had a period where she was not using any assistive device after her hip fracture had healed, but she started using it again because of numbness and fear of falling. *Id.* at 103. She had not mentioned using the cane to her doctor. *Id.* She also described degenerative disease, osteoporosis, and back pain. *Id.* at 102, 106-107. She has left grip and pinching problems and she often drops objects. *Id.* at 105. She estimated that she could sit for a half hour at a time before she feels pain and has to stand, she can stand for no more than one hour, and she can bend over a bit to pick things up, but not for more than 3 minutes. *Id.* at 106. She spends a typical day waking up early, watching television, and sitting outside feeding the birds and squirrels. *Id.* at 111-113. She testified that her days drag on because she used to be an athlete and loved doing yard work, but she cannot do it anymore. *Id.* at 112-113. She also discussed her neck pain and resulting right arm and hand problems, indicating that she had cervical surgery one month prior and felt worse than before the surgery. *Id.* at 115.

Plaintiff discussed her mental health issues, including having suicidal thoughts and her two prior hospitalizations for attempted suicide. Tr. at 117-118. She reported concentration problems due to being overwhelmed with her pain and thinking about her future. *Id.* at 119-120.

The VE then testified. Tr. at 121. The ALJ asked him to assume a hypothetical individual with Plaintiff's age, education and work experience, who could perform light work, with limitations of climbing ramps and stairs frequently; never climbing ladders, ropes or scaffolds; occasionally crawling; frequently handling and fingering with the dominant left hand; avoidance of concentrated exposure to extreme cold and vibration; and the ability to carry out simple tasks that are not fast-

paced. *Id*. at 123-124. When asked if this hypothetical individual could perform Plaintiff's past relevant work, the VE responded that such a person could not perform Plaintiff's past relevant work, but she could perform other jobs existing in significant numbers in the national economy, including the jobs of packager, cashier, and mail clerk. *Id*. at 167.

Plaintiff's attorney asked the VE if modifying the hypothetical individual to have reduced handling to occasional on the dominant left-hand side would impact the number of available jobs, and he responded that it would as the three jobs he identified would not be available. Tr. at 125. He explained that it would have a significant impact as only 20% of the numbers would remain. *Id.* When Plaintiff's counsel asked if jobs would be available for the hypothetical individual who also would be absent from work 4 days or more a month, the VE responded that no jobs would be available. *Id*. at 127.

The ALJ then modified his original hypothetical individual to have a limitation to occasional handling and fingering in the dominant left hand, and the VE responded that jobs would be reduced, but such an individual could perform the jobs of counter clerk, gate guard, and bakery worker, which existed in significant numbers in the national economy. Tr. at 128.

### III.    RELEVANT PORTIONS OF ALJ'S DECISION

On May 1, 2018, the ALJ issued a decision finding that Plaintiff had not engaged in substantial gainful activity since September 29, 2015, the alleged onset date, and he found that since that date, Plaintiff had the severe impairments of:  history of left distal radius wrist fracture, status post internal fixation, placement, and removal of surgical hardware; left post-traumatic history of mildly displaced left inferior pubic rami wall fracture; lumbar DDD; cervical DDD, status-post anterior cervical discectomy and fusion at C4-C5 and C5-C6; anxiety disorder; and depressive disorder. Tr. at 19. The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. *Id.* at 19-20. After considering the record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: frequently climbing stairs and ramps; never climbing ladders, ropes or scaffolds; occasionally crawling; frequently handling

and fingering with the dominant left hand; avoidance of exposure to extreme cold and vibration; and carrying out simple work tasks that are not fast-paced. *Id.* at 21.

Based upon Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ determined that Plaintiff could not perform any past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as a packager, cashier or mail clerk. Tr. at 24-26.  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and she was not entitled to DIB from September 29, 2015, through March 31, 2017, the date that she was last insured. *Id.* at 26.

## IV.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see   20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.    LAW AND ANALYSIS

### A.    TREATING PHYSICIAN OPINIONS

#### 1.    TREATING ORTHOPEDIC SURGEON DR. SCHNELL

Plaintiff first asserts that the ALJ violated the treating physician rule and 20 C.F.R. § 404. 1527 by affording considerable weight to the opinions of reviewing physicians while giving only partial weight to the opinion of Plaintiff's treating orthopedic physician, Dr. Schnell.  ECF Dkt. #13 at 15-20.  For the following reasons, the undersigned recommends that the Court find that the ALJ

failed to provide good reasons for affording less than controlling weight and only partial weight to Dr. Schnell's opinion, particularly with regard to Plaintiff's left wrist and limitations resulting therefrom.

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6ᵗʰ Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons"[3] for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL

---

[3]   The Court notes that the SSA has changed the treating physician rule effective March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence."  Https://www.ssa.gov.  The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

-21-

1725066, at *8 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Further, state agency consultants are highly qualified specialists and experts in Social Security disability evaluation. Social Security Ruling ("SSR") 96–6P, 1996 WL 374180.  The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 404.1527.  The ALJ must consider factors such as the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors in evaluating every medical opinion, unless a treating source's opinion is given controlling weight.  20 C.F.R. § 404.1527(c).

However, an ALJ is not required to explain why he favored one examining opinion over another as the "good reasons" rule requiring an ALJ to explain the weight afforded a treating physician's opinion does not apply. *See Kornec20 ky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006).  Moreover, ALJs are  not bound by the findings of a state agency psychologist, "but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  SSR 96-6p.

-22-

In the ALJ's decision in the instant case, he addressed Dr. Schnell's October 23, 2017 opinion and attributed it only partial weight, finding that Dr. Schnell's treatment notes did not support the significant restrictions that he opined for Plaintiff. Tr. at 23. The ALJ also found that Dr. Schnell's notes documented an unremarkable EMG and relatively normal physical examination findings as to Plaintiff's upper extremities. *Id*. The ALJ further found that Dr. Schnell's acknowledgment of Plaintiff's recent cervical spine fusion in the context of his opinion, "suggest[ed] it may not be representative of the claimant's baseline functioning." *Id*. He also cited to Dr. Schnell's limitations for Plaintiff to avoid heavy lifting, pushing or pulling as evidence that Dr. Schnell's opinion and more severe restrictions were overstated and unsupported. *Id.*

The undersigned recommends that the Court find that the ALJ violated the treating physician rule concerning Dr. Schnell's opinion, specifically with regard to Plaintiff's left wrist impairment and limitations. In explaining the weight that he attributed to Dr. Schnell's opinion, the ALJ found that Dr. Schnell's concurrent treatment notes did not contain findings supporting the limitations that he had opined for Plaintiff as to her likelihood of absences, unscheduled breaks, and her abilities to stand/walk up to two city blocks, sit for six hours of an eight-hour day, occasionally lift up to ten pounds, and her inability to use her left hand for fine or gross manipulation tasks. Tr. at 23, citing Tr. at 973. The ALJ provided no restrictions for Plaintiff with regard to use of her left wrist or hand, except for finding that she could perform only light work and could only frequently handle and finger with her dominant left hand. *Id*. at 21.

The undersigned notes that Plaintiff has undergone three surgeries on her left wrist, two of which have failed, and Dr. Schnell, her treating orthopedic doctor, has consistently found abnormal results concerning Plaintiff's left wrist. The ALJ cites to a March 18, 2016 treatment note where Dr. Schnell indicated that Plaintiff should avoid only heavy lifting, pushing, or pulling as evidence that Dr. Schnell's restrictions in his opinion are too extreme. Tr. at 23, citing Tr. at 652. While this one treatment note appears to concern Plaintiff's left wrist, the ALJ fails to address or reconcile his finding with numerous other facts and notes in the record, including the fact that Plaintiff had surgery to remove the hardware from her wrist less than one month prior to Dr. Schnell's cited treatment note, and Dr. Schnell's April 4, 2016 letter and June 2, 2016 letter indicating that Plaintiff

-23-

had been unable to work since her fall down the staircase on September 27, 2015 due to "her original injury and multiple surgeries" and her slow progress from healing from her "significant left wrist fracture as well as fractures to her superior and inferior pubic rami" and her ongoing symptoms, which included "intermittent pain along the ulnar aspect of the wrist that radiates proximally as well as numbness and tingling." *Id*. at 700, 702.  The ALJ also fails to address or reconcile Dr. Schnell's November 6, 2015 treatment note following Plaintiff's second wrist surgery in which he states that Plaintiff has "marked dorsal comminution of the metaphysis and also the articular surface dorsally. I explained to her that she is likely going to have significant posttraumatic arthrosis in the future." *Id*. at 658.  Dr. Schnell instructed Plaintiff "to continue with strict non-weightbearing on the left upper extremity."  *Id*.  Thus, while the ALJ cites to one treatment note by Dr. Schnell for support, the majority of Dr. Schnell's other treatment notes and the above-referenced letters indicating the contrary must be addressed before affording his opinion less than controlling weight.

Moreover, the ALJ fails to address the treatment notes and evaluations by neurosurgeon Dr. Sweet, who ordered a neuromuscular ultrasound of Plaintiff's left elbow and wrist on April 11, 2017.  The ultrasound showed an abnormal and complex neuromuscular examination, with evidence of a mild left ulnar neuropathy at the elbow and multipe bony changes around the area of the left wrist, including a markely enlarged flex carpi radialis at its insertion near the scaphoid bone, a marked angulation of the tendon of the flexor carpi the radialis over the distal radialis, clear bony changes over the distal ulna, a small effusion in the radial fossa over the elbow joint, and abrupt displacement radially of the ulnar nerve at a location several centimeters proximal to the distal wrist crease by a prominent bony protruberance off the ulnar.  Tr. at 746.  Upon examination and review of Plaintiff's test results on May 26, 2017, Dr. Sweet noted that Plaintiff's muscle strength, sensation and reflexes were abnormal and she indicated that the ultrasound showed compression of the ulnar nerve at the elbow and severe compression at Guyon's canal in the left wrist.  *Id*. at 729.  She diagnosed a cervical disc herniation, cervical nerve root compression, and entrapment of the left ulnar nerve.  *Id*.  Dr. Sweet's plan included Plaintiff undergoing cervical surgery and then conservative management of the ulnar nerves at the elbow.  *Id.*  However, Dr. Sweet recommended that Plaintiff discuss with her orthopedic doctor, Dr. Schnell, "the possibility of repeat surgery of

-24-

the left wrist, particularly, as the bony compression may improve her symptoms of the ulnar nerve at the wrist if near Guyon's canal." *Id*.  Dr. Sweet further recommended that after the repeat surgery, she will reevaluate the ulnar nerves "to determine if we need to do surgery on the nerves for further decompression." *Id.* at 729-730.  Plaintiff underwent cervical surgery on September 7, 2017 with Dr. Sweet. *Id.*

The ALJ also relies upon Dr. Schnell's treatment notes dated June 12, 2017, July 7, 2017 and August 4, 2017 as support for his decision to afford less than controlling weight to Dr. Schnell's opinion, stating that Dr. Schnell only wanted Plaintiff to avoid "any heavy lifting, pushing, and pulling" which was much less than his extreme restrictions outlined in his opinion. Tr. at 23, citing Tr. at 713-715.  However, these treatment notes only concerned Plaintiff's recent proximal humerus fracture and not her left wrist. Tr. at 713-715.  The history portion in each of these treatment notes concerns only Plaintiff's left shoulder as she had fractured it, and Dr. Schnell's examinations, assessments and plans in these three notes only address her shoulder. *Id*.  In fact, Dr. Schnell specifically states that he wanted Plaintiff to "avoid any heavy lifting, pushing, pulling **with that shoulder**" in his August 4, 2017 treatment note.  *Id*. at 713 [emphasis added].

For these reasons, the undersigned recommends that the Court find that the ALJ has not provided good reasons for affording less than controlling weight to Dr. Schnell's opinion.  The undersigned is not recommending that the Court find that Dr. Schnell's opinion is entitled to controlling weight; rather, the undersigned is recommending that the Court remand this case in order for the ALJ to reevaluate Dr. Schnell's opinion in conjunction with the unaddressed medical evidence in the record in order to better review Dr. Schnell's opinion and more fully explain the reasons for the weight that the ALJ affords to that opinion, particularly with regard to Plaintiff's left wrist and any limitations resulting therefrom.

## 2. DR. YOUNG-PSYCHIATRIST

Plaintiff also challenges the ALJ's treatment of the opinion of psychiatrist, Dr. Young. ECF Dkt. #13 at 16-17.  In his November 7, 2017 mental health questionnaire, Dr. Young diagnosed Plaintiff with major depressive disorder, mild alcohol use disorder, and anxiety disorder, unspecified. Tr. at 988.  He opined that Plaintiff's prognosis was fair if she complied with treatment

and he opined that she had serious limitations in: understanding, remembering, and executing detailed instructions and in remembering locations and work-like procedures; maintaining concentration and attention for extended periods; sustaining an ordinary routine without special supervision; working near others without being distracted by them; performing at a consistent pace without an unreasonable number and length of rest periods; and in setting realistic goals or making plans independently of others. *Id*. at 988-989. He further opined that Plaintiff would be absent at least a couple days per week due to her impairments or treatment and she would be off-task for performing job tasks about 50% of an 8-hour workday due to her symptoms. *Id.* at 989. The ALJ attributed Dr. Young's opinion minimal weight. *Id.* at 24. For the following reasons, the undersigned recommends that the Court find that the ALJ provided good reasons for affording less than controlling weight to Dr. Young's opinion, and substantial evidence supports that determination.

The ALJ addressed Dr. Young's November 7, 2017 opinion in his decision. Tr. at 24, citing Tr. at 988. He afforded Dr. Young's opinion minimal weight, explaining that the opinion lacked objective clinical findings to support it, Dr. Young had treated Plaintiff only one time, Dr. Young provided no treatment records to support his opinion, and other treatment notes show that Plaintiff's primary complaints were only physical and failed to show that she had significant memory, concentration, or interpersonal deficits. *Id.* at 24.

The undersigned recommends that the Court find that the ALJ provided good reasons for affording less than controlling weight to Dr. Young's opinion and substantial evidence supports his determination to do so. The ALJ is correct that Dr. Young only saw Plaintiff one time as Dr. Young indicated on the mental health questionnaire that he saw Plaintiff once on July 28, 2017, although she had been seen in the psychiatric department of MetroHealth since March of 2017. Tr. at 988. Questions therefore arise as to whether Dr. Young is even a treating source. *See* 20 C.F.R., § 404.1527(c). Nevertheless, even if he and/or MetroHealth psychiatric department could be deemed Plaintiff's treating medical source, the ALJ also correctly noted that Dr. Young provided no treatment notes supporting his opinion. *Id*. at 23. Further, there are no treatment notes at all from March of 2017 or from MetroHealth concerning Plaintiff's mental health treatment. Other treatment

-26-

notes relating to Plaintiff's psychiatric impairments show that her primary care physician, Dr. Stecyk, noted on November 10, 2016 that Plaintiff presented to him for medication refills, a follow up for her joint pains, and a referral to psychiatry because she reported that her anxiety was bad. *Id.* at 876.  Upon examination, Dr. Stecyk found that Plaintiff's judgment and insight were intact, her mood and affect were abnormal, and she was anxious, depressed, and tearful.  *Id.* at 878.  She was referred to psychiatry for her anxiety.  *Id.* at 879.  Dr. Stecyk's October 13, 2016 treatment note shows that Plaintiff presented for a refill of her Xanax and upon physical examination, he found that her judgment and insight were intact, and her mood and affect were normal.  *Id*. at 882.  Dr. Stecyk made the same psychiatric findings upon examination of Plaintiff on August 25, 2016.  *Id.* at 888.  Dr. Stecyk noted in his psychiatric findings on August 17, 2016 were that Plaintiff's judgment and insight were intact, but her mood and affect were abnormal and she was anxious as she had lost her house and car.  *Id*. at 893-894.  These treatment notes do not support and are inconsistent with Dr. Young's extreme limitations for Plaintiff, as properly found by the ALJ.

The record does contain a psychiatric evaluation by The Centers for Families and Children dated April 20, 2015 when Plaintiff presented there requesting a new medication prescriber because she was new to Medicaid benefits and needed refills of her medications.  Tr. at 342, 682.  She indicated that she had anxiety tendencies that ran in her family.  *Id*.  She reported that different events over the last 10-15 years affected her, causing depression and then anxiety, such as her divorce, her father dying, her then becoming the main support for her mother, and then her mother passing away in 2012 from dementia complications.  *Id.*  She reported the incident of putting a knife to her neck due to stress caused by her neighbor and her subsequent hospitalization following that event for a suicide attempt.  *Id.*  The ALJ addressed Plaintiff's hospitalization for this attempt, noting that the record documented acute alcohol intoxication with no intent or plan upon sobriety. *Id.* at 24, citing Tr. at 782, 806.  Plaintiff was diagnosed with depressive disorder, not otherwise specified, post-traumatic stress disorder, and alcohol-related disorder not otherwise specified at The Center for Families and Children.  *Id.* at 344.  The same medications were prescribed for her, with a decrease in the dosage of Xanax and an increase in the dosage of Buspar.  *Id*. at 346.  The same medications were prescribed for her on May 26, 2015 as well.  *Id*. at 350.  A September 4, 2015

treatment note also supports the ALJ's finding as Plaintiff appeared for medication management denying depression, but having occasional sadness, and having anxiety about her new job and making mistakes. *Id.* at 685. Plaintiff reported decreased anxiety with Xanax and Vistaril and she reported that Xanax was very helpful. *Id.* Dr. Bukuts indicated on September 25, 2015 that Plaintiff was still upset over the loss of her partner 2-3 weeks prior and her mother 3 years ago, but she had a new relationship and she denied suicidal or homicidal ideations. *Id.* at 354-355, 686-687. A March 7, 2016 treatment note indicated that Plaintiff was struggling with self-medication by drinking alcohol with benzodiazepine use. *Id.* at 351. The same medications were prescribed. *Id.*

Dr. Whitmore, Ph.D, also conducted a psychological evaluation on behalf of the agency. Tr. at 636. Dr. Whitmore found upon examination that Plaintiff had fluent and clear speech, coherent and goal-directed thought processes, no evidence of hallucinations or delusions, and she was dysphoric and anxious. *Id.* at 637-639. Dr. Whitmore further noted that Plaintiff had good insight and judgment, and she had intact attention and concentration, although she reported that she felt overwhelmed. *Id.* at 639. Dr. Whitmore diagnosed major recurrent depression, adjustment disorder with mixed anxiety and depression, and panic disorder. *Id.* at 640. In discussing her work-related mental abilities, Dr. Whitmore cited to Plaintiff's self-report that her understanding, remembering, and carrying out of instructions was "excellent." *Id.* at 641. Dr. Whitmore opined that Plaintiff was able to maintain attention and concentration and Plaintiff agreed that she does very well in this ability. *Id.* As to Plaintiff's abilities and limitations in responding appropriately to supervisors and co-workers in a work setting, Dr. Whitmore opined that Plaintiff had a pleasant and cooperative demeanor and Plaintiff reported that she worked well in her past jobs. *Id.* Finally, in describing her abilities to respond appropriately to work pressures in a work setting, Dr. Whitmore opined that Plaintiff would have difficulties due to her pain and psychological condition, although Plaintiff reported that she did fine in the past with pressures and she was able to manage work pressures. *Id.* The ALJ found that this limitation by Dr. Whitmore was not supported by Plaintiff's own reports that she was able to manage work pressures and had done so in prior employment. *Id.* at 24.

Based upon the law, the record and the ALJ's decision, the undersigned recommends that the Court find that the ALJ applied the proper legal standards in evaluating Dr. Young's opinion as

-28-

he provided good reasons to afford less than controlling weight to that opinion, since Dr. Young treated Plaintiff only once, he had no treatment notes to support his opinion, and no other treatment records supported such extreme limitations.  The ALJ then properly reviewed the evidence and appropriate factors in determining the weight to give to Dr. Young's opinion, and properly attributed it minimal weight, and he also properly reasoned that Dr. Whitmore's limitation concerning Plaintiff's ability to respond appropriately to work pressures was negated by Plaintiff's own reports that she was able to do so and had done so in her prior employment.  Further, substantial evidence supports the ALJ's determination that Dr. Young's opinion was not entitled to more than minimal weight due to his lack of support for his opinion, lack of treatment notes for the opinion, and the evidence inconsistent with that opinion.

### B.    CREDIBILITY

In light of the undersigned's recommendation that the Court remand the instant case for reevaluation and more thorough analysis of Dr. Schnell's opinion, the undersigned further recommends that the Court decline to address the ALJ's assessment of Plaintiff's credibility because the ALJ's re-evaluation and analysis on remand may impact his findings on this issue in the remaining steps of the sequential evaluation.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 417 (6th Cir. 2011).

### VII.    RECOMMENDATION AND CONCLUSION

For the above reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND Plaintiff's case for reevaluation and proper analysis concerning the opinion of Dr. Schnell.


Date: June 21, 2019                          ___/s/George J. Limbert_____
                                             GEORGE J. LIMBERT
                                             UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

-29-